R.S. Smith, J. (dissenting).
The Commissioner of Health has promulgated “Guidelines,” which say that certified registered nurse anesthetists (CRNAs) should provide certain services in connection with office-based surgery only when they are subject to what the Commissioner considers appropriate supervision. Plaintiff, an association of New York CRNAs, challenges the Guidelines, asserting that they are regulations in disguise. I think it is clear that the Guidelines will injure CRNAs’ opportunities for employment, and I therefore dissent from the majority’s conclusion that CRNAs lack standing because they have not shown that the Guidelines will injure them.
The Facts
The pertinent portion of the Guidelines is quoted in full in the majority opinion (majority op at 212). The Guidelines say that, when a CRNA administers anesthesia in an office setting, “[supervision . . . should be provided by a physician, dentist or podiatrist who is physically present, who is qualified by law, regulation or hospital appointment to perform and supervise the administration of the anesthesia and who has accepted responsibility for supervision.” The Guidelines go on to itemize five things that the person providing supervision should do, including “perform a preanesthetic examination and evaluation” and “remain physically present during the entire perioperative period.” The majority opinion does not describe the evidence provided by plaintiff of the economic harm that these provisions of the Guidelines will do to its members. This is a striking omission, for plaintiffs showing of injury is powerful, detailed and virtually unrebutted.
The complaint alleges that the Guidelines change the status quo in several ways that limit what a CRNA can do. The complaint says that CRNAs now commonly work under the supervision of surgeons who are not “qualified ... to perform the administration of anesthesia,” and that the Guidelines will change this by “effectively requiring] the presence of an anesthesiologist [i.e. a doctor specializing in anesthesia] at all office-based surgeries.” The complaint also alleges that the “pre-anesthetic examination and evaluation” are now performed routinely by CRNAs, and that requiring a physician to be pres *216 ent during the “entire perioperative period” effectively “necessitates the presence of an anesthesiologist since the surgeon routinely does not directly monitor the patient during the periods before and after the operation.” As a result, according to the complaint, “[b]ecause it is cost-prohibitive for both CRNAs and anesthesiologists to be present during surgery, the [Guidelines effectively prohibit CRNAs from performing anesthesia services in an office-based setting.”
The allegations of harm in the complaint were amplified in affidavits submitted to Supreme Court. Sandra Tunajek, a CRNA and the Director of Practice of the American Association of Nurse Anesthetists, testified: “I can state unequivocally that the effect of these Guidelines will be to require the presence of an anesthesiologist whenever regional or general anesthesia are administered in the office-based setting.” Tunajek’s affidavit did not merely state this conclusion, but explained the basis for it in detail, dealing first with the impact of the requirement that the CRNA’s supervisor be a “physician, dentist or podiatrist . . . qualified ... to perform and supervise the administration of the anesthesia.” The gist of her explanation is that most surgeons lack these qualifications, and must hire either an anesthesiologist or a CRNA to administer anesthesia; the Guidelines would effectively force them to choose an anesthesiologist. Tunajek’s testimony on this point is extensive, and I quote it only in part:
“Guideline G (1) (a) specifically requires that the supervising physician must be ‘qualified by law, regulation or hospital appointment to perform . . . the administration of anesthesia.’ Operating physicians who are qualified by law, regulation or appointment to actually perform the administration of anesthesia are extremely rare. Most physicians who perform surgery in the hospital, ambulatory surgery or office setting are not qualified to administer anesthesia. These physicians rely upon the expertise of a CRNA or an anesthesiologist, both of whom are trained to administer anesthesia. While operating physicians are qualified to deal with surgical complications, and may have limited knowledge of anesthesia complications, they are not qualified to administer anesthesia.”
In addition, Tunajek testified that, of the five steps which the Guidelines require a physician to perform, “four . . . are *217 routinely performed by CRNAs or anesthesiologists.” Again, she set forth the basis for her conclusion in clear and persuasive detail, and again I quote only an excerpt, relating to one of the requirements—that of the supervisor’s physical presence:
“[T]he Guidelines require the physician to remain physically present during the entire ‘perioperative period’ and immediately available for management of ‘anesthesia-related complications or emergencies.’ In virtually all surgeries, the operating surgeon does not remain present with the patient during the entire perioperative period. It is the job of the CRNA or the anesthesiologist to remain with the patient to assure that the patient is recovering properly from the effects of the anesthesia. Further, the CRNA or the anesthesiologist is specifically trained to deal with complications or emergencies arising from the administration of anesthesia.”
Again, Tunajek explained, the effect of the Guidelines is to require the presence of an anesthesiologist at office-based surgeries. Tunajek concluded:
“If an anesthesiologist’s presence is compulsory, the CRNA would have no role in the office-based setting. It is simply not economically feasible to have both an anesthesiologist and a CRNA involved in an office-based surgery. Virtually all office-based surgeries conducted throughout the United States involve the presence of a CRNA or an anesthesiologist, not both.”
Plaintiff also submitted the affidavit of an eye surgeon, Kenneth Anthone. Dr. Anthone testified that he and his partner “have routinely used CRNAs since 1994”; that “[n]either I nor my partner consider ourselves to be able to ‘perform’ anesthesia”; and that “[w]e do not remain physically present with the patient during the post-operative period.” Dr. Anthone concluded: “Since there would be no reason to have both a CRNA and an anesthesiologist present during the procedure, and the cost of such duplication of services would be prohibitive, the net effect of the application of the Guidelines to our practice would be the elimination of all positions for CRNAs.”
In defendants’ factual submissions to Supreme Court, their response to all this evidence of harm was virtual silence. Defendants’ answer denied plaintiff’s allegation that the *218 Guidelines “effectively require [CRNAs] to be supervised by anesthesiologists,” but the more specific allegations of the complaint that I quoted or summarized above were met either with a reference “to the guidelines themselves as the best evidence of their contents” or with a denial of “sufficient knowledge or information to form a basis for responding.”[1] In the affidavits submitted below, defendants presented no evidence on the “injury in fact” issue except one conclusory and ambiguous sentence in the affidavit of Wayne Osten, Director of the Office of Health Systems Management. Osten testified: “The Guidelines do not require anesthesiologist supervision as alleged by plaintiff, and I am aware of no objective information to substantiate plaintiffs economic concerns.”[2] Osten added that the Guidelines served worthy goals which “far outweigh potential economic impacts upon [CRNAs]”—thus virtually admitting that such “potential economic impacts” exist.
On this record, the majority concludes that plaintiff has failed to show that CRNAs will be injured by the Guidelines.
Discussion
The majority opinion correctly states the two-part test for determining standing—plaintiff must show “injury in fact” and must also show that the injury is within the “zone of interest” appropriate to confer standing. The first part of the test is of course the easier to satisfy, and common sense suggests that it will be satisfied in most cases. People do not usually spend the time and money to bring lawsuits challenging actions that do not in fact injure them.
Here, as I pointed out above, plaintiff made a powerful factual showing of injury in Supreme Court, and defendants submitted no contrary evidence of substance. But defendants now argue that “injury in fact” is lacking. The gist of their argument is that the Guidelines could not possibly injure CRNAs because the Guidelines, to the extent plaintiff complains of them, are meaningless.
*219 Defendants claim that the requirement for supervision of anesthesia by “a physician . . . who is qualified by law, regulation or hospital appointment to perform and supervise the administration of the anesthesia” requires only supervision by “a physician” and that the “who is qualified” clause is tautological. Defendants point out that there is no separate legal requirement for the credentialing of an anesthesiologist, and they conclude from this that “all M.D.s are qualified by law to perform anesthesia and therefore qualify under the Guidelines to supervise CRNAs.” Thus, defendants say that “[w]ith respect to physicians, this guideline adds nothing to the parameters of medical practice.” Why the Commissioner would write a guideline that “adds nothing” remains a mystery.[3]
I find defendants’ reading of this portion of the Guidelines completely unpersuasive. Plaintiff’s evidence shows, and defendants do not dispute, that there are physicians who are not in fact qualified to administer anesthesia. Indeed, one such physician submitted an affidavit to that effect below. To say that all physicians—even those who could not administer anesthesia without endangering a patient’s life—are “qualified by law” within the meaning of the Guidelines because there is no law that prohibits them from administering anesthesia strikes me as a bit of verbal cleverness devised by lawyers for litigation purposes.
There is not a hint in the Guidelines themselves, or in the extensive materials submitted to Supreme Court concerning the development of the Guidelines, to the effect that the words “physician . . . who is qualified” were intended as a mere redundancy. On the contrary, an e-mail generated during the drafting of the Guidelines shows that the author of the clause thought it did have meaning: the head of the relevant subcommittee said in the e-mail that, while the words of the Guidelines did not “specify . . . an anesthesiologist,” they implied that “only someone with qualifications as outlined” should supervise *220 CRNAs. If, as defendants now claim, all physicians have these qualifications, this e-mail does not make sense.[4]
Thus the essential meaninglessness of the “who is qualified” language, as applied to doctors, was apparently first discovered by the lawyers defending this lawsuit.[5] But it does not really matter whether defendants are right or wrong about the “who is qualified” clause, for defendants do not even attempt to answer plaintiffs demonstration that CRNAs will be injured by other provisions of the Guidelines. For example, there is uncontradicted proof in the record, quoted above, that a supervising physician does not ordinarily perform “preanesthetic examination and evaluation” and is not present during the “entire perioperative period,” as the Guidelines require. If the Guidelines are implemented, supervising physicians who are not able, or do not choose, to take on these added responsibilities will have to hire anesthesiologists to perform them—making CRNAs superfluous. Defendants nowhere even assert that this is not so.
In short, defendants’ response to plaintiffs position on the “injury in fact” issue is partly unpersuasive and partly nonexistent. The majority opinion does not remedy any of the deficiencies in defendants’ argument.
The majority says that plaintiffs claim of injury is founded on “two layers of speculation” (majority op at 213). The first “layer” is “that the Guidelines will be rigorously enforced as regulations”[6] (majority op at 213). But the question of whether the Guidelines are recommendations or regulations is the question presented by this case on the merits—the question that plaintiff is asking us to decide, and that we are refusing to decide on standing grounds. Plaintiff need not show it would win on the merits in order to establish its standing (see e.g. Society of Plastics Indus, v County of Suffolk, 11 NY2d 761, 780 [1991] [inappropriate to consider the merits in determining standing]; Matter of Dairylea Coop, v Walkley, 38 NY2d 6, 9 [1975] [same]).
*221 The majority’s second “layer[ ] of speculation” is that the Guidelines, if enforced, “will effectively harm CRNAs” (majority op at 213). But to label plaintiff’s expectation of harm as “speculation” is simply to ignore the extensive evidence I described above. The majority does ignore this evidence; and it does not analyze either side’s argument on the “injury in fact” issue in any detail.
The majority says that it is “not at all ‘obvious’ that, even if enforced as regulations, the Guidelines would in fact injure any of plaintiff’s members as claimed.” (Majority op at 213.) It bolsters this remark with a very brief review of the Guidelines, largely ignoring plaintiffs explanations of why the Guidelines are harmful, and swallowing whole, without noting its flaws, defendants’ interpretation of the “who is qualified” phrase. The majority also says that physicians who “do not routinely or ordinarily perform measures now recommended in the Guidelines” might “themselves choose to do so, as opposed to firing CRNAs and hiring anesthesiologists” (majority op at 214). There are two answers to this: First, the record shows that the reason most physicians do not themselves perform these “measures” is that most of them are not qualified to perform them; secondly, even if some do choose to perform the tasks themselves, it is most unlikely, based on the evidence in this record, that so few will turn to anesthesiologists that CRNAs will suffer no injury.
The majority’s conclusion is agnostic: “The recommended procedures might, or might not, actually affect the employment of CRNAs in physicians’ offices.” (Majority op at 214.) The majority’s reasoning seems to suggest that any doubt about the existence of plaintiffs injury is a sufficient reason to deny standing. I do not think this is, or ever has been, the law—and in any event, for the reasons I have stated, I do not think there is any doubt about the injury to the CRNAs here.
The injury in fact issue here is controlled by Matter of Dental Socy. of State ofN.Y. v Carey (61 NY2d 330 [1984]), in which an organization of licensed dentists was held to have standing to challenge a Medicaid dental fee reimbursement schedule. The plaintiff alleged, and the record demonstrated, that among its members were some who would receive less compensation because of the inadequate fee schedule; this was enough to show injury in fact. The present case differs only in that the facts relevant to the injury to plaintiffs members are more complicated; the record, as described above, overwhelmingly demonstrates that at least some CRNAs will lose the opportunity for work if the Guidelines are implemented.
*222 The only case cited by the majority as supporting its holding is Rudder v Pataki (93 NY2d 273 [1999]). In Rudder, an association of social workers and a union of health and human services workers were among the plaintiffs who challenged an Executive Order of the Governor. That order had prevented the Department of Health from instituting a requirement that certain hospital positions be held only by people having a Master’s degree in social work (MSW). Some members of the organizational plaintiffs held MSWs, and the Court acknowledged that those members “will not have the benefit of increased job prospects” because of the Executive Order in issue (id. at 279). But, the Court said, “this does not mean that any one individual member with an MSW has been or will be injured” (id.). The Court concluded that the anticipated injury to the association members was “[a]t best . . . only ‘tenuous’ and ‘ephemeral’ ” (id.).
I admit I find this portion of the Rudder opinion difficult to explain; I can no more understand why people holding MSWs were not injured in Rudder than I can understand how the CRNAs are not injured here. I believe that Rudder was more soundly based on its second alternative holding—that since the organizational plaintiffs represented both social workers with MSWs and social workers without them, “the interests of the organizations . . . are not entirely germane to the relief they seek . . .” (id.). In any event, even if it could be shown that Rudder rests on a logical error, I would not regard that as justification for being equally illogical in the present case.
I find decisions like the present one, and like the first alternative holding in Rudder, to be troubling because they render the law of standing unpredictable. Indeed, I am convinced from a reading of the briefs that no party expected this case to be dismissed on “injury in fact” grounds.[7] Standing is a complicated subject at best, and there is always the danger that it will become a black box, from which a judicial conjurer can extract the desired result at will.-, I do not say that any such thing has happened in this case; but I do say that such things have happened before, and will probably happen again. Today’s decision can only increase that unfortunate likelihood.
*223 Because I am convinced that injury in fact is present and because I believe that CRNAs are within the “zone of interests” protected by the statutes and legal doctrines plaintiff is seeking to enforce (see Dental Socy., 61 NY2d 330 [1984]), I would hold that plaintiff has standing to maintain this action. Since the majority concludes otherwise, the merits of the action are moot, and I do not address them.
Judges G.B. Smith, Ciparick, Rosenblatt, Graffeo and Read concur with Chief Judge Kaye; Judge R.S. Smith dissents in a separate opinion.
Order reversed, etc.

. As to one paragraph of the complaint (1f 30), defendants’ answer first admitted it in part, and referred the court to the Guidelines as to the remainder; then, later, denied the entire paragraph. The reason for this inconsistency is not apparent.

. This statement is even less impressive than it appears on its face because of the use of the word “require.” It is defendants’ position that the Guidelines are only recommendations and do not “require” anything. Thus Osten’s statement could be literally true, in his own opinion, even if the Guidelines’ “recommendations” include anesthesiologist supervision.

. Defendants say that the clause requiring a “physician, dentist or podiatrist. . . who is qualified” was included “because the Guidelines also apply to dentists and podiatrists.” This leaves unanswered the question of why the clause was made applicable to physicians. If defendants are correct, the Guidelines should read “by a physician, or by a dentist or podiatrist . . . who is qualified.”

. I assume that—as the author’s e-mail seems to suggest—some nonanesthesiologists could meet the criteria specified for supervisors in the Guidelines, and that plaintiffs claim that the Guidelines would require an anesthesiologist at all office-based surgeries is therefore overstated. But this does not affect the thrust of plaintiffs “injury in fact” argument—that the Guidelines will compel many physicians to hire anesthesiologists instead of CRNAs.

. It will be interesting to see whether, having prevailed on their argument that the language is meaningless, defendants will now interpret it that way in practice.

. The majority’s reference to “rigorous” enforcement is pure surplusage. CRNAs will be injured if the Guidelines are enforced at all—the “rigor” of the enforcement would affect only the extent, not the fact, of their injury.

. Defendants’ “injury in fact” argument is not only extremely weak, as I pointed out above; it is presented in perfunctory and unenthusiastic fashion. Though “injury in fact” is logically a threshold issue, defendants do not discuss it until after a lengthy argument on the “zone of interests” issue. They then devote three pages of their 46-page brief to “injury in fact.”